UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re:

FORTUNOFF HOLDINGS, LLC and FORTUNOFF
CARD COMPANY, LLC,

Debtors.

Chapter 7
Case No. 09-10497 (RDD)
Jointly Administered

---

---

IAN J. GAZES, as Chapter 7 Trustee of the Estates of
Fortunoff Holding, LLC and Fortunoff Card Company,
LLC,

Plaintiff,

-against-

NEW YORK STATE DEPARTMENT OF LABOR,
Defendant.

Adversary Proceeding
No. 10-3339 (RDD)

---

## DEFENDANT'S MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION
## AND IN SUPPORT OF CROSS-MOTION TO DISMISS COMPLAINT

ANDREW M. CUOMO
ATTORNEY GENERAL OF THE
STATE OF NEW YORK
By:

PATRICIA KAKALEC
Chief of Labor Bureau

SETH KUPFERBERG
Chief of General Labor Section

SETH KUPFERBERG
Assistant Attorney General
120 Broadway
New York, NY 10271
(212) 416-8856
Attorney for Respondents

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF THE CASE...................................................................................................3

    A. Underlying Facts .................................................................................................3

    B. The New York WARN Act ..................................................................................7

        1. The Federal WARN Act .................................................................................7

        2. The New York WARN Act.............................................................................10

        3. The DOL's Enforcement Role ........................................................................11

    C. Proceedings Related to the New York and/or Federal WARN Act Claims to Date ....13

        1. The DOL Administrative Proceeding and Proofs of Claim..............................13

        2. Other Proceedings and Proofs of Claim...........................................................15

    D. The Present Adversary Proceeding ..............................................................................16

ARGUMENT ...........................................................................................................................18

I. THE DOL ADMINISTRATIVE PROCEEDING IS NOT STAYED .......................................18

II THE COMMISSIONER, NOT THIS COURT, MUST DECIDE THE MERITS OF
FORTUNOFF'S SUPPOSED NEW YORK WARN ACT AFFIRMATIVE DEFENSES ..........25

    A. The "Liquidating Fiduciary" Affirmative Defense......................................................27

    B. The "Unforeseeable Business Circumstances" Affirmative Defense ...........................31

    C. The "Faltering Company" Affirmative Defense ...........................................................35

    D. The Good-Faith Reduction-in-Liability Issue...............................................................36

IIII. GENERAL EQUITABLE PRINCIPLES DO NOT SUPPORT AN INJUNCTION ...........37

CONCLUSION.........................................................................................................................40

i

# TABLE OF AUTHORITIES

## CASES

*Allen v. Sybase, Inc.*, 468 F.3d 642 (10th Cir. 2006) ...................................................................31

*In re APA Transport Corp. Consol. Litigation*, 541 F.3d 233 (3d Cir. 2008) ..............................35

*Barnett v. Jamesway Corp.*, 235 B.R. 329 (Bankr. S.D.N.Y. 1999) ............................................30

*In re Bluffton Casting Corp.*, 186 F.3d 857 (7th Cir. 1999) ............................................................9

*Board of Governors of the Federal Reserve System v. MCorp Financial, Inc.*,
502 U.S. 32 (1991) ..................................................................................................................... 22-23

*Brock v. Rusco Indus., Inc./*, 842 F.2d 270 (11th Cir. 1988) ........................................................19

*In re Cabrini Medical Ctr.*, 2010 WL 1418862 (Bankr. S.D.N.Y., Apr. 7, 2010) ................ 22-23

*Carpenters District Council of New Orleans & Vicinity v. Dillard Dept. Stores, Inc.*,
15 F.3d 1275 (5th Cir. 1994) ............................................................................................... 31-3230

*Chao v. BDK Indus., L.L.C.,* 296 B.R. 165 (C.D. Ill. 2003) ...................................................19, 21

*Chao v. Mike & Charles Inc.*, 2006 WL 18467 (S.D. Tex., Jan. 4, 2006) ....................................20

*In re Circuit City Stores, Inc.*, 2010 WL 120014 (Bankr. E.D. Va., Jan. 7, 2010) ......................24

*Ciigroup Global Markets, Inc. v. VCG Special Master Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010) ...........................................................................................................37

*City of New York v. Exxon Corp.*, 932 F.2d 1020 (2d Cir. 1991) .......................................... 21-22

*Cody, Inc. v. County of Orange*, 281 B.R. 182 (S.D.N.Y. 2002),
*app. dismissed*, 338 F.3d 89 (2d Cir. 2003) .......................................................................... 26-27

*Coker v. Pan American World Airways, Inc.*, 950 F.2d 839 (2d Cir. 1991) ................................26

*Conn. Dep't of Social Services v. Salerno*, 1997 WL 711444 (D.Conn., Aug. 15, 1997) ............22

*Crossley v. Lieberman*, 90 B.R. 682 (E.D. Pa. 1988), *aff'd*, 868 F.2d 566 (3d Cir. 1989)............26

*Eddleman v. United States Dep't of Labor*, 923 F.2d 782 (10th Cir. 1991) ..................................18

*In re Fiber Optek Interconnect Corp.*,
2009 WL 3074605 (Bankr. S.D.N.Y., Sept. 23, 2009) ............................................... 18-19, 20, 22

*In re First Magnus Financial Corp.*, 390 B.R. 667 (Bankr. Ariz. 2008),
*aff'd*, 403 B.R. 659 (D. Ariz. 2009) ...........................................................................................24

*First Nat'l Bank v. Reed*, 306 F.2d 481 (2d Cir. 1962) ...................................................................26

*In re Hanlin Group, Inc.*, 176 B.R. 329 (Bankr. N.J. 1995) ...........................................................24

*Henderson v. Powermate Holding Corp. (In re Powermate Holding Corp.)*,
394 B.R. 765 (Bankr. Del. 2008) .................................................................................................24

*In re Jerome Pollock Jr. Stone Artist, Inc.*, 402 B.R. 534 (Bankr. N.D.N.Y. 2009) ........19, 21, 22

*Keene Corp. v. Coleman (In re Keen Corp.)*, 164 B.R. 844 (Bankr. S.D.N.Y. 1994) ..................23

*Leider v. Ralfe*, 387 F.Supp.2d 283 (S.D.N.Y. 2005)....................................................................27

*Martin v. Safety Elec. Constr. Co.*, 151 B.R. 637 (D.Conn. 1993) ...............................................19

*In re Methyl Tertiary Butyl Ether Prods. Litig.*, 488 F.3d 112 (2d Cir. 2007) .............................22

*NLRB v. 15th Ave. Iron Works, Inc.*, 964 F.2d 1136 (2d Cir. 1992) .........................................18, 20

*In re Ngan Gung Restaurant, Inc.*, 183 B.R. 689 (Bankr. S.D.N.Y. 1995) .............................19, 20

*Nippon Steel Corp. v. United States*, 219 F.3d 1348 (Fed. Cir. 2000) .........................................39

*Official Committee of Unsecured Creditors v. United Healthcare System, Inc.*,
200 F.3d 170 (3d Cir. 1999) .................................................................................................... 30-31

*Pena v. American Meat Packing Corp.*, 362 F.3d 418 (7th Cir. 2004)...........................................32

*People v. P.J. Video, Inc.*, 68 N.Y.2d 296 (1986)..........................................................................27

*People v. Roth.*, 52 N.Y.2d 440 (1981) .........................................................................................27

*Roquet v. Arthur Andersen LLP*, 398 F.3d 585 (7th Cir. 2005).....................................................32

*SEC v. Brennan*, 230 F.3d 65 (2d Cir. 2000) .......................................................................... 19-21

*SIPC v. Bernard L. Madoff Investment Securities LLC (In re Madoff)*,
429 B.R. 423 (Bankr. S.D.N.Y. 2010) .........................................................................................23

*State v. N. Storonske Cooperage Co.*, 174 B.R. 366 (N.D.N.Y. 1994) ..........................................22

*Teamsters Local 572 v. Weslock Corp.*, 66 F.3d 241 (9th Cir. 1995) ............................................30

*Thompson v. Magnoleum Petroleum Co.*, 309 U.S. 478 (1940) ............................................. 25-26

*In re Travacom Communications, Inc.*, 300 B.R. 635 (Bankr. W.D.Pa. 2003) ......................19, 21

*United States ex rel. Fullington v. Parkway Hosp.*, 351 B.R. 280 (E.D.N.Y. 2006) ....................21

*VIP of Berlin, LLC v. Town of Berlin*, 539 F.3d 179 (2d Cir. 2010) ...........................................37

## STATUTES

Bankruptcy Code § 105, 11 U.S.C. § 105......................................................................................1

Bankruptcy Code § 362, 11 U.S.C. § 362.......................................................................1-2, 18-25

28 U.S.C. § 1334...........................................................................................................................26

Worker Adjustment and Retraining Notification Act ("Federal WARN Act"),
29 U.S.C. §§ 2101-2109 .........................................................................................7-12, 27-32, 35

New York Civil Practice Law & Rules Article 78 .......................................................................11

New York Labor Law § 10 .............................................................................................................1

New York Labor Law § 21 .............................................................................................................1

New York State Worker Adjustment and Retraining Notification Act ("New York WARN Act"),
New York Labor Law §§ 860-860-i ..................................................... 1-3, 7-13, 18-25, 27-37, 38

New York State Administrative Procedure Act § 202............................................................12, 13

## REGULATIONS AND REGULATORY HISTORY

20 C.F.R. Part 639........................................................... 7, 8, 9, 12-13, 28, 30, 31, 35

12 NYCRR Part 701 ....................................................................................................................13

12 NYCRR Part 921 ....................................................................................... 12-13, 28, 30, 31

54 F.R. 16042 (Apr. 20, 1989) ....................................................................................................28

2009 NY REG TEXT 174919 (NS) .......................................................................................12, 35

**NEW YORK STATE DEPARTMENT OF LABOR'S MEMORANDUM OF LAW
IN OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION
AND IN SUPPORT OF CROSS-MOTION TO DISMISS COMPLAINT**

The Defendant New York State Department of Labor ("DOL"), by its attorney the Attorney General of the State of New York, submits this Memorandum of Law in opposition to the motion ("Plaintiff's Motion") of Ian J. Gazes as Chapter 7 Trustee ("Trustee"), and in support of the DOL's cross-motion to dismiss the Complaint. The Complaint and Plaintiff's Motion, which are substantially similar, both seek to enjoin the DOL's administrative proceeding to enforce the New York State Worker Adjustment and Retraining Notification Act ("New York WARN Act" or "New York Act"), New York Labor Law §§ 860-860-i.

## PRELIMINARY STATEMENT

The New York WARN Act empowers the New York Commissioner of Labor ("Commissioner"), who heads the DOL pursuant to New York Labor Law §§ 10 and 21, to enforce the New York Act through administrative proceedings. New York Labor Law § 860-f. Since the Bankruptcy Code ("Code") excepts such proceedings from the bankruptcy stay, as discussed below, the DOL has pursued such a proceeding ("Administrative Proceeding").

In both the Complaint and Plaintiff's Motion, the Trustee claims that the Administrative Proceeding is stayed by § 362 of the Code, interferes with the bankruptcy case and should be enjoined under the Code's § 105. Complaint, Docket # 1[1], ¶¶ 40 and 47; Plaintiff's Motion, Docket # 2, ¶¶ 34-35. In the alternative, again in both the Complaint and Plaintiff's Motion, the Trustee seeks an injunction under normal equitable principles on the grounds that the bankruptcy

---

[1] Docket numbers cited without identification are from the present adversary proceeding, No. 10-3339. Docket numbers cited from the main bankruptcy case, No.09-10407, are identified as "Main Case." Docket numbers cited from another adversary proceeding, *Iannacone v. Fortunoff Holdings, LLC*, No. 09-1044, are identified as "Iannacone Action."

estate "will be irreparably harmed if the DOL proceeds," the Trustee should (or, in the case of Plaintiff's Motion for a preliminary injunction, might) prevail on the merits of the Complaint, and "the DOL is not prejudiced" by enjoining the Administrative Proceeding if it can pursue similar claims in bankruptcy court. Complaint, ¶¶ 53-59; Plaintiff's Motion, ¶¶ 37-38. Both the Trustee's theories are incorrect.

Contrary to Plaintiff's Motion, the Code's § 362(b)(4) and implementing precedent make clear that administrative proceedings to enforce State labor standards do not interfere with a bankruptcy case and are not stayed by § 362, as long as the proceedings stop at liquidating – i.e., establishing the amount of – a monetary liability actual collection of which is left to the bankruptcy court. In the present case, the Commissioner can adjudicate whether and how much Fortunoff Holdings, LLC ("Fortunoff") owes former workers for failing to provide notice of termination required by the New York Act, including affirmative defenses recognized by the New York Act and invoked by the Trustee. The Commissioner can and will consider any factual showing, as well as legal argument, which the Trustee may put in as to these defenses, or any other New York WARN Act issue; her decision, reviewed in state court if necessary, will liquidate, i.e. establish the amount of, the DOL bankruptcy claim. This Court, for its part, must adjudicate such questions as whether and which bankruptcy priority is accorded that claim by the Code, and which if any of the Commissioner's findings hold implications for other bankruptcy claims filed by workers or others. As with any other claim whose dollar amount has been established, these rulings by the Court will ultimately determine how much money the DOL can actually collect; the Administrative Proceeding merely liquidates the claim.

The Trustee's alternative argument, that an injunction is justified by normal equitable principles, is also mistaken. Not only is the Complaint subject to dismissal on the merits, but the

2

bankruptcy estate will not suffer irreparable, or any significant, harm if the Administrative Proceeding is completed. As just stated, the Court, not the Commissioner, must authorize any actual distribution from estate assets, including deciding whether and to what extent the DOL claim has priority over other claims and whether and how the Commissioner's findings affect those claims. No basis for the Trustee's argument that the estate will be significantly harmed by having to defend against similar but not identical claims in two forums has been or can be established, and his claim that an injunction would not prejudice the DOL ignores that the New York WARN Act entitles the Commissioner, subject to review by New York courts, to interpret and apply the statute.

## STATEMENT OF THE CASE

### A.     Underlying Facts

On February 5, 2009, Fortunoff filed its Chapter 11 petition, explaining: "Beginning in January 2009, Fortunoff began to experience a severe liquidity crisis that is attributable to a host of factors." Specifically, inventory had been low, credit terms tight and availability of cash a problem ever since an earlier Chapter 11 reorganization in February and March 2008.

> These constraints were substantially exacerbated in the last several months by a host of other factors, including, among others, dismal sales over the 2008 holiday season, increasing weakness in consumer spending on high-end furniture and jewelry, and reduced borrowing capacity under the Prepetition Credit Agreement, and the costs associated with the proposed strategic expansion of [Fortunoff's] jewelry line into the Lord & Taylor retail stores.

> The Debtors' financial difficulties have been exacerbated by the recent national economic downturn .... [S]pecialty jewelers were particularly hard hit in 2008, with unusually slow sales in the spring and during the fourth quarter....

> The high costs of materials and fuel prices have also increased Fortunoff's cost[s].... [T]he ongoing housing market decline has been particularly damaging....

> In response to these competitive pressures and financial constraints, since the end of the holiday season of 2008, the Debtors have aggressively pursued an equity investment, or alternatively, a sale of some or all of their assets,

including discussions with "potential buyers, investors and partners,.... as well as liquidators" and "Wells Fargo, as agent for the Lenders under the Prepetition Revolver Facility." Fortunoff sought "authority to conduct an auction for the sale of substantially all of the Debtors' assets (the 'Sale Process')" and said it planned

> to continue to operate their businesses so that they can continue the Sale Process in order to either (i) sell, as a going concern, in whole or in part, substantially all of its assets, or if such a transaction is not possible, (ii) to wind down the business through an orderly liquidation and going out of business sales....

February 5, 2009 Declaration of Christopher Sim ("First Sim Declaration"), Main Case Docket # 14, ¶¶ 15-21; *see also* Transcript of February 6, 2009 Hearing, Main Case Docket # 75, at 8-9 (Debtors' lawyer attributes the bankruptcy to "economic pressures currently facing a number of businesses," and states that "[d]epending on the nature of the bids... we would anticipate accepting a going concern or the typical retail inventory liquidator type bids").

On February 6, 2009 the Debtors sought approval to sell Fortunoff's assets – either "as a going concern," or through liquidation of inventory "at all or some of the Debtors' retail stores;" either "in a single sale to a single offeror or in parts to different offerors" – through an auction to be held in late February 2009. February 6, 2009 Motion for Approval of Sales Procedures, Main Case Docket # 42, ¶¶ 20-21. Contrary to allegations in the Trustee's present Complaint and Plaintiff's Motion (Docket ## 1 and 2, ¶¶ 14 and 9 respectively), the February 6, 2009 Motion was *not* "to approve the procedures for the sale of substantially all of the Debtor's assets to liquidators and for the conduct of going out of business sales ('GOB Sales')." Rather, the Debtors were still pursuing the possibility of Fortunoff's continuing as an ongoing business.

On February 23, 2009, the Debtors reported to the Court that although after the bankruptcy petition's filing they "continued to seek potential bidders that might be interested in purchasing all or a portion of the Debtors' businesses on a going concern basis and/or acting as a liquidator," including "express[ing] the Debtors' preference for going concern bids" to over 20 potential bidders, "no potential purchaser ultimately made a going concern bid," making it necessary to seek authorization of a liquidation, going-out-of-business ("GOB") sale. February 23, 2009 Declaration of Christopher Sim ("Second Sim Declaration"), Main Case Docket # 250, ¶ 13. On February 25, 2009 the Court approved such a GOB sale, in an order expressly recognizing the continuing right of State "or other governmental units when enforcing public health and safety laws, criminal, tax, labor, employment... and consumer protection laws" to institute actions or proceedings against the Debtors. Order Approving Sale, Main Case Docket # 370, ¶ 12.[2]

The GOB sale continued, and Fortunoff continued in the retail business, until June 2009. Declaration of Emilee Samtani, Iannacone Action Docket # 40 ("Samtani Declaration"), ¶¶ 6-8. On August 17, 2009, the Debtors moved to convert the Chapter 11 reorganization to a Chapter 7 liquidation case. Motion for an Order Converting the Cases, Main Case Docket # 899. The Court granted that motion on October 1, 2009. Order, Main Case Docket # 945.

On February 5, 2009, the same day as the bankruptcy filing, Fortunoff notified the DOL by certified mail that it "may be forced to close" five New York work sites, together employing over 1,000 workers. Declaration of Kenneth Golden filed herewith ("Golden Declaration"), ¶ 2

---

[2] *See also* Transcript of February 25, 2009 Hearing, Main Case Docket # 464, at 20-25 (Court notes New York Attorney General's reservation of right to seek state-court relief under consumer protection statute, pursuant to this standard clause permitting State agencies to act under their police and regulatory powers).

and Exhibit A. Fortunoff also distributed at the five sites a notice stating "that, due to recent and unexpected circumstances beyond its control, Fortunoff... may be forced to close its corporate headquarters," having "to date,... been unsuccessful in finding a buyer" or additional working capital. The notice distributed to employees stated:

> This notice is being issued pursuant to the federal Worker Adjustment and Retraining Notification Act ("WARN") and any applicable state law. The Company does not concede that any WARN obligation exists for this notice, and indeed is continuing to seek a buyer to operate this facility, but also wants its employees to begin considering their plans and options.

> If the Company closes the facility or there is a reduction-in-force, it expects to eliminate positions beginning February 13, 2009 and continuing over the subsequent 14-day period. We anticipate that your employment with the Company will be terminated sometime during this period....

> While the Company would have preferred to provide earlier notice of this potential shutdown, to do so would have impaired or precluded the Company's efforts to obtain additional capital or investment. As such, notice for this facility closure falls within the exceptions provided in section 3(b)(1) and 3(c) of the WARN Act, codified at 29 U.S.C. § 2102(b)(1)....

Golden Declaration, ¶ 4 and Exhibit B.

According to its former Human Resources Director, "On or about February 13, 2009, Fortunoff proceeded with the termination of more than 200 employees who worked at the Lindbergh Facility" (corporate headquarters in Uniondale), and "Substantially all of Fortunoff's workforce was let go by the time of the conclusion of the liquidation sale in early June." Samtani Declaration, Iannacone Action Docket # 40, ¶¶ 5-8. The DOL and Trustee ultimately agreed (subject to additional and contradictory facts' coming to the DOL's attention) that Fortunoff's records show that a total of 173 workers at four sites with worker numbers large enough to be covered by the New York WARN Act (Uniondale, Westbury, Garden City and White Plains) were terminated from the February 5th notification to February 13th, 37 more in the

6

balance of February, and 65 more before May 6, 2009: in all, 275 during the 90 days following the February 5th notification. Golden Declaration, ¶¶ 7-10 and 13.

## B.     The New York WARN Act

The New York WARN Act, enforcement of which is at issue on the present motion, was enacted August 5, 2008 and took effect at the beginning of February 2009, just before the Debtors' bankruptcy filing. New York L. 2008, c. 475. The New York Act was modeled on and in many respects resembles, but in others diverges from, the federal Worker Adjustment and Retraining Notification Act ("Federal WARN Act" or "Federal Act") enacted 20 years earlier, 29 U.S.C. §§ 2101-2109. Since the New York and Federal Acts can usefully be compared and contrasted, there is a body of precedent interpreting the Federal Act and the latter was specifically referenced in Fortunoff's February 5, 2009 notification to employees, it is helpful to begin by summarizing the older, more familiar statute.

### 1.     The Federal WARN Act

The Federal WARN Act applies to firms with at least 100 full-time employees, 29 U.S.C. § 2101(a)(1), and defines *employment loss* as "employment termination, other than discharge for cause, voluntary departure, or retirement," § 2101(a)(6). *Plant closing* means the "shutdown of a single site of employment... if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more [full-time] employees," § 2101(a)(2).[3] In counting employment losses to determine whether a plant closing took place, "employment losses for 2 or more groups at a single site... which occur within any 90-day period" are

---

[3] An implementing regulation adds: "An employment action that results in the effective cessation of production or the work performed by a unit, even if a few employees remain, is a shutdown." 20 C.F.R. § 639.3(b).

aggregated "unless the employer demonstrates that the employment losses are the result of separate and distinct actions and causes" – in effect, a rebuttable presumption that the period referred to in § 2101(a)(2) is not 30 but 90 days, § 2102(d).[4] And *affected employees* means those "who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass layoff by their employer," § 2101(a)(5). § 2102(a) requires a covered employer, before ordering a plant closing, to give 60 days' written notice to affected employees (or their union, if any[5]), the State, and the chief elected official of a unit of local government.

There are exceptions to the notification requirement "if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable," § 2102(b)(2)(A),[6] or, for a closing, if when notice would otherwise have been required, the employer "was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice would have precluded the employer from obtaining the needed capital," § 2102(b)(1).[7] If

---

[4] An implementing regulation explains: "Look ahead 90 days and behind 90 days to determine whether employment actions both taken and planned each of which separately is not of sufficient size to trigger WARN coverage will, in the aggregate for any 90-day period, reach the minimum numbers for a plant closing or a mass layoff and thus trigger the notice requirement." 20 C.F.R. § 639.5(a)(ii).

[5] The "representative of the affected employees" referred to in § 2102(a) is defined by § 2101(a)(4) as "an exclusive representative of employees within the meaning of section 9(a) or 8(f) of the National Labor Relations Act."

[6] According to an implementing regulation, an "important indicator" that this exception applies "is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control," for example "sudden and unexpected termination of a major contract," a strike, or "an unanticipated and dramatic major economic downturn." 20 C.F.R. § 639.9(b)(1).

[7] An implementing regulation states that this exception "should be narrowly construed."

an exception applies, the employer "shall give as much notice as is practicable and... a brief statement of the basis for reducing the notification period," § 2102(b)(3). An employer which violates § 2102 by failing to provide required notification is liable "to each aggrieved employee who suffers an employment loss as a result of such closing or layoff," for back pay and benefits "for the period of the violation, up to a maximum of 60 days." There is also a civil penalty for failure to notify the local government, "of not more than $500 for each day of such violation," unless "the employer pays to each aggrieved employee the amount for which the employer is liable to that employee within 3 weeks from the date the employer orders the shutdown," § 2104.

These liabilities are enforced through civil suits, brought by a "person seeking to enforce such liability, including a representative of employees or a unit of local government aggrieved," in a federal court, which is given discretion both to reduce the liability or penalty if the employer proves it acted "in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation," and to award the prevailing party attorneys' fees, § 2104. Though the U.S. Secretary of Labor is to prescribe regulations, § 2107, those regulations confirm that enforcement "will be through the courts" in private civil actions and that the U.S. Department of Labor "has no legal standing in any enforcement action" and will not even advise about specific cases. 20 C.F.R. § 639.1(d). However, rights and remedies under the Federal WARN Act "are in addition to, and not in lieu of," other statutory rights, § 2105, including rights under State statutes such as the New York Act.[8]

---

20 C.F.R. § 639.9(a).

[8] An implementing regulation repeats that the Federal Act does not "supersede any laws... that provide for additional notice or additional rights and remedies." 20 C.F.R. § 639.1(g); *cf. In re Bluffton Casting Corp.*, 186 F.3d 857, 861 (7th Cir. 1999) (though § 2104 makes remedies under the Federal Warn Act "the exclusive remedy for any violation of this Act," claims "based

9

## 2. The New York WARN Act

The New York WARN Act resembles its federal model in many but not all respects. For example, New York Labor Law §§ 860-a and 860-e give definitions similar to those of 29 U.S.C. §§ 2101 and 2102(d), except that an "employer" with at least 50 rather than 100 full-time employees is covered by the New York Act, and a "plant closing" must result in employment loss for at least 25 rather than 50 full-time employees. Labor Law § 860-b imposes a notification requirement similar to that of 29 U.S.C. § 2102(a), except that 90 rather than 60 days' notice must be given, and those entitled to notification include workers (and their union, if any), the DOL, and local workforce investment boards rather than workers (or their union, if any), the State, and a unit of local government.

New York Labor Law § 860-c states exceptions to the notification requirement which, at least to judge by the statutory language, generally resemble those of 29 U.S.C. § 2102(b).[9] Like § 2104, §§ 860-g(1) and 860-h impose liability and a civil penalty on violators,[10] and § 860-g(6) and (7) empower the decision-maker, in his or her discretion, to reduce the award if an employer acted in good faith. The New York penalty is for failure to notify the DOL, § 860-h(1), rather than, as under the Federal WARN Act, for failure to notify a unit of local government.

---

on the same set of facts, yet arising out of another substantive right, are not preempted").

[9] The linguistic resemblance is not total. For example, 29 U.S.C. § 2102(b)(2)(A) excuses the notice requirement if either a plant closing or a mass layoff results from unforeseeable business circumstances; Labor Law § 860-c accepts this excuse (unlike others, for example "natural disaster, such as a flood, earthquake, or drought") only in the case of plant closings.

[10] The New York Act liability is "to each employee entitled to notice who lost his or her employment," comparable to the Federal Act's "each aggrieved employee who suffers an employment loss."

Under Labor Law § 860-g(2) and (4)(d), the New York Act liability to workers is "for the period of the employer's violation, up to a maximum of sixty days," and is reduced by any liability paid by the employer "under any applicable federal law" – that is, the Federal Act. Because of the New York Act's lower numerical thresholds in defining *employer* and *plant closing* and requirement of 90 rather than 60 days' notice, liability to New York workers can and often will be greater under the New York than under the Federal Act. For the present case, another difference between the two laws is even more important.

### 3.    The DOL's Enforcement Role

Unlike the Federal Act, which provides for enforcement only through private litigation in federal court, the New York Act provides for enforcement in either, or both, of two ways. First, New York Labor Law § 860-f empowers the Commissioner to enforce the statute including directing her, § 860-f(1), to prescribe necessary rules including, at a minimum, rules for administrative hearings by the DOL. Under § 860-f(2), the Commissioner in such a proceeding has, "in addition to all other powers granted by law," authority to examine "any information of an employer necessary to determine whether a violation of this article has occurred, including to determine the validity of any defense." Under § 860-f(6), if after an administrative hearing she finds a violation of the statute, she "shall issue an order which shall include any penalties," subject to a review proceeding commenced in the New York Appellate Division pursuant to Article 78 of the New York Civil Practice Law & Rules; upon affirmance, or if not so appealed, "the order of the commissioner containing the amount found to be due... shall have the full force and effect of a judgment." Under § 860-f(7), the Commissioner is to distribute back pay recovered to the employees.

The second way in which the New York Act can be enforced – similar to the *only* way to enforce the Federal WARN Act – is through a civil individual or class action, in any court of competent jurisdiction, brought by an aggrieved employee, local government or union. Labor Law § 860-g(7). Both enforcement methods may be followed in a single case: § 860-g(4) states that an employer's liability under § 860-g(1) shall be reduced by:

> (e) In an administrative proceeding by the commissioner, any liability paid by the employer prior to the commissioner's determination as the result of a private action brought under this article.

> (f) In a private action brought under this article, any liability paid by the employer in an administrative proceeding by the commissioner prior to the adjudication of such private action.

Pursuant to § 860-f(1)'s direction that rules for access to administrative hearings be prescribed and § 202(6) of the New York State Administrative Procedure Act ("SAPA"), the DOL filed an emergency rule governing New York WARN Act matters, including those relating to administrative proceedings, which took effect along with the New York WARN Act itself at the beginning of February 2009, has remained in effect through subsequent readoptions, and is published at 12 NYCRR Part 921.[11] In many but far from all respects, the DOL's regulations mirror U.S. Department of Labor regulations implementing the Federal WARN Act. For example, both state that a plant "closing" can occur "even if a few employees remain,"[12] counsel employers assessing how many employment losses a contemplated action involves to look 90

---

[11] SAPA § 202(6)(b) permits promulgation of emergency rules for an initial 90 days with subsequent 60-day readoptions. As explained when the emergency rule was first adopted, the DOL had discussed the new statute at summer and fall meetings of employment and corporate bar associations, issued press releases, and held press conferences, and had received numerous suggestions about and requests for regulations. Notice of Emergency/Proposed Rulemaking, Feb. 18, 2009, 2009 NY REG TEXT 174919 (NS).

[12] *Compare* 20 C.F.R. § 639.3(b) (*see* n. 3 above) and 12 NYCRRR § 921-1.1(j).

days ahead and behind,[13] and caution that unforeseeable business circumstances involve a "sudden, dramatic, and unexpected action or condition outside the employer's control."[14] On the other hand, the DOL also expressly departed from the federal regulations in some areas, sometimes with more lenience towards employers, others with more stringency.[15] For the administrative proceedings authorized by § 860-f, the DOL's regulations provide for a formal hearing "conducted by an employee of the Department of Labor designated by the Commissioner to be the hearing officer" and governed by 12 NYCRR Part 701 and SAPA. 12 NYCRR § 921-7.4.

### C.     Proceedings Related to the New York and/or Federal WARN Acts To Date

#### 1.  The DOL Administrative Proceeding and Proofs of Claim

On November 4, 2009, the DOL issued a Notice of Hearing and Designation of Hearing Officer pursuant to New York Labor Law § 860-f and 12 NYCRR Part 921, scheduling a hearing on whether Fortunoff violated the New York WARN Act by failing to provide workers at five New York sites with the required 90 days' advance notice of termination. In preparation for the hearing in the Administrative Proceeding, the DOL also subpoenaed various records and documents from Fortunoff. Golden Declaration, ¶ 5; *see also* Complaint (Docket # 1), ¶ 27.

---

[13] *Compare* 20 C.F.R. § 639.5(a)(ii) (*see* n. 4 above) and 12 NYCRRR § 921-2.1(b)(1).

[14] *Compare* 20 C.F.R. § 639.9(b)(1) (*see* n. 6 above) and 12 NYCRRR § 921-6.3(a).

[15] The Notice of Emergency Rulemaking, n. 11 above, states that the DOL decided not to count out-of-state workers "toward determining the size of the workforce needed to cover an employer under the state WARN Act," even though "federal regulations count workers at foreign sites of employment to determine whether an employer's workforce would subject the employer to the federal Act." On the other hand, "While the Federal WARN rules encourage, but do not require the inclusion of useful information on dislocated worker assistance programs," the DOL "chose to require the notices to contain information on the potential availability of unemployment insurance and reemployment services."

The Trustee, who by this time had been appointed in the Debtors' converted Chapter 7 case, supplied records and documents in response to the subpoena. Following discussion and adjournments of the scheduled hearing, the DOL and Trustee agreed, as previously stated, that based on Fortunoff records, a total of 275 workers at sites with worker numbers subject to the New York WARN Act had been terminated before the expiration of 90 days from the February 5, 2009 notification, including 210 by the end of February 2009. Also based on Fortunoff records, and similarly subject to the DOL's revisiting the issue in light of additional and contradictory facts, the DOL and Trustee further agreed that full New York WARN Act liability to the 275 workers, assuming that no statutory defenses applied and that there was no discretionary reduction in a liability award, was $2.18 million. Golden Declaration, ¶¶ 5-10 and 13; *see also* Complaint, ¶¶ 28-29.

On June 5, 2009, the bar date for claims in the Debtors' bankruptcy case – and prior to receipt of requested information from and discussion with the Trustee, and agreement with him that based on the information provided, a lower liability of $2.18 million existed – the DOL had filed two proofs of claim in the bankruptcy case (## 105 and 106), each in the estimated total amount of $5.3 million. The claims, similar except that one claimed an administrative priority, stated that they were "filed in the alternative in case the legal status of this type of claim should be contested," and that the amount stated reflected "an estimate... ,... subject to verification and completion of an investigation by the Commissioner."

## 2. Other Proceedings and Proofs of Claim

On February 12, 2009, an individual worker, Joanne Iannacone, later joined by two other named plaintiffs in a May 22, 2009 Amended Complaint, filed an adversary proceeding "on behalf of herself, and other similarly situated former employees... terminated... as the result of... plant closings ordered by Defendants on or about February 12, 2009... who were not provided 60 days advance written notice... as required by" the Federal and New York WARN Acts.[16] In addition to the Debtors, non-Debtor corporate affiliates are also named as defendants; all the defendants are alleged to have "constituted a 'single employer.'" Complaint and Amended Complaint, Iannacone Action Docket ## 1 (¶¶ 1 and 34) and 10 (¶¶ 1 and 43) respectively. Counsel has argued that pursuit of the non-Debtor defendants on a single-employer theory may recover "funds that are not in the estate, and at no cost to the estate, relieving the estate of having a sizeable problem in how to resolve the WARN claims." Transcript of September 10, 2009 Hearing, Main Case Docket # 931 ("Sept. 10, 2009 Transcript"), at 42; *see also id.* at 43 and 56 (Court raises possibility of pursuing non-Debtor defendants separately, in a non-bankruptcy forum).

On June 5, 2009 the plaintiffs in the Iannacone Action requested class certification, which the defendants in the action including Fortunoff have opposed. Motion for Class Certification and Memorandum in Opposition to Class Certification, Iannacone Action Docket ## 18 and 38 respectively. The Court has questioned whether certification of a class including workers who did not file individual proofs of claim before the bar date is appropriate in bankruptcy court, Sept. 10, 2009 Transcript at 47-52, and noted that with respect to the New York WARN Act cause of action, "New York State has asserted a claim" as well, *id.* at 59; *see*

---

[16] The latter, as previously discussed, actually requires 90 days' advance notice.

*also id.* at 67-68. As of September 10, 2009, the Debtors' counsel informed the Court that "[n]o discovery has taken place" in the Iannacone Action. *Id.* at 61. The Trustee's present Complaint and Plaintiff's Motion (Docket ## 1 and 2, ¶¶ 20 and 15 respectively) state that the parties to the Iannacone Action "have been engaged in informal discovery," but the docket in the Iannacone Action reflects no significant activity since the plaintiffs filed reply papers in support of class certification in August 2009. A conference and hearing on the class certification motion have been repeatedly rescheduled, most recently to September 29, 2010. Notice of Adjournment, Iannacone Action Docket # 53.

On June 5, 2009, the bar date for claims in the Debtors' bankruptcy case, counsel for the plaintiffs in the Iannacone Action filed numerous proofs of claim (## 23 through 97, 99 through 104 and probably others) on behalf of individual workers under the Federal and New York WARN Acts. Counsel has stated that his firm filed "several hundred" proofs of claim, Sept. 10, 2009 Transcript at 47.

The Trustee's present Complaint and Plaintiff's Motion (Docket ## 1 and 2, ¶¶ 24 and 19 respectively) state that "Approximately 1,100 proofs of claims have been filed by or on behalf of former employees many of which assert claims for damages under the [Federal] WARN Act and/or the NY WARN Act." No details nor any action concerning such claims has been alleged.

### D. The Present Adversary Proceeding

On June 29, 2010, the Trustee filed the present adversary proceeding. The Complaint, Docket # 1, and Plaintiff's Motion, Docket # 2, allege that Fortunoff has "a complete defense" to the Administrative Proceeding "based on any one of the Affirmative Defenses," namely, "the liquidating fiduciary defense, the unforeseen business circumstances defense, the faltering company defense and the good faith defense (collectively the 'Affirmative Defenses')," which

16

defenses, according to the Complaint, are also applicable in the Iannacone Action and "in the context of the numerous proofs of claim filed by the individual former employees." Complaint, ¶¶ 21 and 30-31; Plaintiff's Motion, ¶¶ 16 and 25-26. The Complaint further alleges that the Administrative Proceeding "is not subject to the police and regulatory power exception under Bankruptcy Code § 362(b)(4)" because the proceeding has as its "sole, or at least the primary, purpose... to protect the pecuniary interest of the government and/or to adjudicate the private rights of the former employees," and "cannot have any deterrent effect on the Debtors as the Debtors... [have] ceased their normal business operations... and no longer operate nor will operate a business." Complaint ¶¶ 36-37.

Based on these allegations, the Complaint "seeks declaratory judgment that the Administrative Action is automatically stayed pursuant to Bankruptcy Code § 362(a) and not subject to the police and regulatory power exception." *Id.*, ¶ 40. It seeks to enjoin the Administrative Proceeding, alleging that the latter "has resulted in the Debtors' estates suffering irreparable diminution" and "could result in conflicting results with those obtained in the [Iannacone Action] and/or the claims objection process," making an injunction appropriate under either § 105 of the Code or normal equitable principles. *Id.*, ¶¶ 44-45, 47 and 56. According to the Complaint, the DOL "will not be irreparably harmed" by an injunction "as its substantive rights will be protected by the proofs of claim filed by it in the Bankruptcy Case." *Id.*, ¶¶ 48 and 57.

Substantially the same claims are made in Plaintiff's Motion seeking a preliminary injunction, Docket # 2. *See* Preliminary Statement above. As discussed below, Plaintiffs' Motion should be denied and the Complaint dismissed.

## POINT I

## THE DOL ADMINISTRATIVE PROCEEDING IS NOT STAYED

Section 362(b)(4) of the Bankruptcy Code excepts from its stay provisions any "proceeding by a governmental unit... to enforce such governmental unit's... police and regulatory power." The DOL when enforcing the New York WARN Act is not just a collection agent for workers – though its administrative proceedings may aid in that – but serves a law enforcement function. That is evident from, among other features of the New York Act, its provision for a civil penalty if the DOL is not given statutory notice, Labor Law § 860-h(1); the grant of authority to the Commissioner "to examine any information of an employer necessary to determine whether a violation of this article has occurred," § 860-g(1) and (2); and the authorization of a DOL administrative proceeding even if affected employees have also brought litigation, § 860-g(4). Although § 362(b)(4) of the Code has not yet been specifically applied to the New York Act (a new statute which took effect just days before this bankruptcy case was filed, and one whose federal counterpart does not provide for administrative enforcement), courts have routinely found that analogous proceedings to enforce State and federal labor protective statutes, undertaken by both State and federal agencies analogous to the DOL, fall within the exception.

In this Circuit the leading case is *NLRB v. 15th Ave. Iron Works, Inc.*, 964 F.2d 1136, 1137 (2d Cir. 1992), which held a National Labor Relations Board ("NLRB") administrative proceeding to enforce a previous NLRB order to be within the § 362(b)(4) exception. *See also*, *e.g.*, *Eddleman v. United States Dep't of Labor*, 923 F.2d 782 (10th Cir. 1991) (U.S. Department of Labor administrative proceeding to enforce federal prevailing wage law); *In re Fiber Optek*

*Interconnect Corp.*, 2009 WL 3074605, ** 7-9 (Bankr. S.D.N.Y., Sept. 23, 2009) (DOL administrative proceeding to enforce New York prevailing wage law); *In re Jerome Pollock Jr. Stone Artist, Inc.*, 402 B.R. 534 (Bankr. N.D.N.Y. 2009) (DOL administrative proceeding to enforce New York Minimum Wage Act); *In re Ngan Gung Restaurant, Inc.*, 183 B.R. 689 (Bankr. S.D.N.Y. 1995) (New York Attorney General's action to enforce tip protection and overtime laws).[17]

The difference between a governmental unit's police power to liquidate (*i.e.*, establish the amount of) a liability, which is not stayed by a bankruptcy filing, and actual collection of the liability, which can only be accomplished through the bankruptcy court, was explained in *SEC v. Brennan*, 230 F.3d 65, 72-3 (2d Cir. 2000), which held that when seeking "to impose financial liability on a party," the government

> is plainly acting in its police or regulatory capacity – it is attempting to curb certain behavior.... It is this added expense that deters .... Accordingly, up to the moment when liability is definitively fixed by entry of judgment, the government is acting in its police or regulatory capacity – in the public interest, it is burdening certain conduct so as to deter it.

Only "once liability is fixed and a money judgment has been entered" does this cease to be true and the automatic stay begin to apply; that is, actual collection of the liability, once imposed, must be effected through the bankruptcy court. *Id.*; *cf. Ngan Gung Restaurant*, 183 B.R. at 694 ("Actual collection of the back pay and liquidated damages claims must proceed according to normal bankruptcy procedures") (citations omitted).

---

[17] *Cf. In re Travacom Communications, Inc.*, 300 B.R. 635, 637-638 (Bankr. W.D.Pa. 2003) (Pennsylvania proceeding to enforce Pennsylvania Prevailing Wage Act); *Martin v. Safety Elec. Constr. Co.*, 151 B.R. 637 (D.Conn. 1993) (U.S. Department of Labor suit to enforce federal prevailing wage law); *Brock v. Rusco Indus., Inc.*, 842 F.2d 270 (11th Cir. 1988) (U.S. Department of Labor suit to enforce federal minimum wage); *Chao v. BDK Indus., L.L.C.*, 296 B.R. 165 (C.D.Ill. 2003) (same).

Contrary to the present Complaint, that the DOL's Administrative Proceeding will also protect individual rights of former Fortunoff employees makes no difference to the principles of *NLRB v. 15th Ave. Iron Works* and *SEC v. Brennan*: in those cases, just as in the present one, payment to those who had been wronged was the principal – in *15th Ave. Iron Works*, the only – remedy sought. *SEC v. Brennan*, 230 F.3d at 73, explained that the award of money is what deters wrongdoing and brings a proceeding within the police power exception, "not the identity of the entity which [the wrongdoer] must eventually pay." As stated in *Ngan Gung Restaurant*, 183 B.R. at 694:

> that the government seeks to liquidate employee wage claims or to compel employers to make restitution of unpaid funds, does not alter the fact that it is acting pursuant to its police and regulatory authority.... [N]umerous courts have held that government actions under both federal and state labor laws seeking remedies that were restitutionary in nature are excepted from the stay by § 362(b)(4).

*Cf. Chao v. Mike & Charlies' Inc.*, 2006 WL 18467, **2-3 (S.D. Tex., Jan. 4, 2006).

Nor is it true, as the present Complaint also claims, that the fact that the Debtors are no longer in business means that there is no deterrent effect and the police and regulatory power exception does not apply. In many of the cases cited above, bankrupt employers were also already out of business and the only practical relief which could possibly result from exercise of a governmental unit's police power was obtaining money in redress of past misconduct.[18] This was true, for example, in *NLRB v. 15th Ave. Iron Works*, 964 F.2d at 1337, where the debtor "had filed a chapter 7 bankruptcy petition, and had gone out of business." *SEC v. Brennan*, 230 F.3d at 72, held that there is a deterrent effect on others when a governmental unit establishes

---

[18] Besides decisions discussed below, the recent decision of Judge Morris of this Court's Poughkeepsie district in *In re Fiber Optek Interconnect Corp.*, *supra*, as well as *Chao v. Mike & Charlies' Inc.*, *supra*, also involved already-shut-down companies in Chapter 7 cases.

monetary liability for past misconduct, and that that is enough for the governmental unit to be "plainly acting in its police or regulatory capacity." *Cf. United States ex rel. Fullington v. Parkway Hosp.*, 351 B.R. 280, 287 (E.D.N.Y. 2006) ("imposition of financial liability... deters unlawful behavior and thus serves the police and regulatory efforts").

In *Travacom Communications*, 300 B.R. at 638, involving enforcement of the Pennsylvania Prevailing Wage Act, the debtor had filed a Chapter 7 petition and argued – just like the Trustee in the present case – that:

> (a) the Debtor had permanently ceased operations... thereby eliminating... the risk of future violations,.... (b) the Commonwealth thus had no need to seek injunctive relief,.... (c) the Commonwealth... actually only sought to obtain monetary damages to redress past alleged violations... and (d) a governmental agency, as a matter of law, validly exercises its Police and Regulatory Power only if it seeks to prevent future harm by a debtor.

The court rejected the argument. *Cf. Chao v. BDK Indus.*, 296 B.R. at 169 (rejecting a claim that since no party continued to operate "there can be no future violations... and injunctive relief restraining future conduct is not proper"), and the recent ruling of the Bankruptcy Court for New York's Northern District in *Jerome Pollock Jr. Stone Artist*, 402 B.R. 534:

> Stone Artist asserts, and the DOL disputes, that because the Order to Comply lacks a demand for injunctive relief, it falls outside the § 362(b)(4) exception....
>
> .... "[W]here a governmental unit is suing a debtor to prevent or stop violation of... regulatory laws, *or attempting to fix damages for violation of such law*, the action or proceeding is not stayed under the automatic stay." H.R. REP. No. 95-598....

*Id.* at 536-7 (emphasis added by court).

Besides such rulings involving labor statutes, the Second Circuit has applied the same principle to environmental statutes. For example, *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1024 (2d Cir. 1991), found that "damage actions for completed violations of

21

environmental laws," not just for injunctive relief against continuing violations, are exempted from the automatic stay, since "[a]ctions to collect damages after violations... provide an effective deterrent to violators." *Cf. In re Methyl Tertiary Butyl Ether Prods. Litig.*, 488 F.3d 112, 132 (2d Cir. 2007); *State v. N. Storonske Cooperage Co.*, 174 B.R. 366, 372-3 (N.D.N.Y.1994). *Conn. Dep't of Social Services v. Salerno*, 1997 WL 711444 (D.Conn., Aug. 15, 1997), applied the police power exception in still another analogous situation, allowing a governmental unit to seek monetary damages for Medicaid fraud from a defendant who had filed a chapter 7 petition and was already prohibited from further participation in Medicaid or Medicare, making additional Medicaid fraud by him impossible.

Plaintiff's Motion, ¶¶ 51-54, cites a number of opinions describing alternative "pecuniary interest" and "public policy" tests for when agency action is exempt from the automatic stay. These tests are also discussed in such decisions as *Fiber Optek* and *Jerome Pollock Jr. Stone Artist* which, as discussed above, found DOL administrative proceedings analogous to the present one to be exempt from the stay. The DOL is not pursuing a State pecuniary interest, such as collection of a commercial debt owed to the State; it is enforcing the State's labor standards.

Nor can it matter, as the Complaint implies it should, that the Trustee believes the Administrative Proceeding to be unfounded or an improper use of the DOL's police and regulatory power. For as recently explained by Chief Judge Gonzalez of this Court in *In re Cabrini Medical Ctr.*, 2010 WL 1418862, **2-3 (Bankr. S.D.N.Y., Apr. 7, 2010), the Court's power does not "extend to interference in the comprehensive regulatory laws of a state or its enforcement of its police powers." As noted in *Cabrini*, the Supreme Court in *Board of Governors of the Federal Reserve System v. MCorp Financial, Inc.*, 502 U.S. 32, 40 (1991), rejected a contention that "for § 362(b)(4) to obtain, a court must first determine whether the

proposed exercise of police or regulatory power is legitimate and that therefore, in this litigation the lower courts did have the authority to examine the legitimacy of the Board's actions and to enjoin those actions." Even if it were assumed that the Trustee has a colorable objection to the Administrative Proceeding's legitimacy, which is not the case, *MCorp*, as *Cabrini* found, "supports the proposition that bankrupt courts cannot look at whether an exercise of police power is legitimate."

Plaintiff's Motion also argues, ¶¶ 33-35, that such cases as *SIPC v. Bernard L. Madoff Investment Securities LLC (In re Madoff)*, 429 B.R. 423, 430-437 (Bankr. S.D.N.Y. 2010), and *Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 849 (Bankr. S.D.N.Y. 1994), show that the DOL is trying to evade bankruptcy court jurisdiction and should be enjoined under § 105 of the Code or otherwise. Those cases bore no resemblance to this one. *Madoff*, for example, enjoined non-bankruptcy state-court cases in which creditors of Bernard Madoff's bankrupt investment company sought to recover as individuals from his alleged accomplices in fraud, who were also being sued on similar theories in this Court on behalf of the bankruptcy estate. Judge Lifland found that the non-bankruptcy plaintiffs, who sought "to redress a harm common to all" estate creditors and not a "particularized injury" that creditors in general did not share, were "usurping causes of action belonging to the estate," 429 B.R. at 430-2, and should not be permitted "to divert the funds for themselves" by "recover[ing] the very funds sought by the Trustee through his avoidance actions," *id.* at 435-7. Similarly in *Keene*, plaintiffs were enjoined from pursuing for themselves claims belonging to the estate in general. In the present case, the DOL in the Administrative Proceeding seeks to liquidate a particularized claim which it will then seek to collect from the estate through this Court. It is not trying to collect in some other forum on a general claim that belongs to and must be litigated on behalf of all estate creditors.

Finally, the Trustee calls it "unhelpful for the DOL to argue that the automatic stay is inapplicable because the WARN Act claims are post-petition administrative expense claims," arguing that although *Henderson v. Powermate Holding Corp. (In re Powermate Holding Corp.)*, 394 B.R. 765, 775-8 (Bankr. Del. 2008), indeed found Federal WARN Act claims to be like a severance pay liability incurred in its entirety on workers' termination dates (hence, in the present case, post-petition), Fourth Circuit precedent, *see In re Circuit City Stores, Inc.*, 2010 WL 120014, *3 (Bankr. E.D.Va., Jan. 7, 2010), implies that the claims should instead be treated as arising when notification should have been provided (hence, in the present case, 90 days before workers were actually terminated, pre-petition). Plaintiff's Motion, ¶¶ 48-49. Whatever the merits of the argument for treating WARN Act claims as pre-petition, it is completely irrelevant to the present Complaint and Plaintiff's Motion.

Should the matter ultimately be contested, the DOL will indeed seek to persuade this Court that the conclusion implied by the analysis of *Powermate* and similar cases[19] is correct and that the DOL claim, once liquidated by the Commissioner, should be treated for bankruptcy purposes as post-petition and administrative. But that has nothing to do with whether the automatic stay prevents the DOL from completing its Administrative Proceeding or with the DOL's argument that the stay does not apply. The stay does not apply because the Administrative Proceeding is limited to liquidating the DOL's claim, regardless how this Court may ultimately decide to classify the claim for bankruptcy purposes. The question whether a New York WARN Act claim is a post-petition administrative claim or is pre-petition, like others

---

[19] *See also In re Hanlin Group, Inc.*, 176 B.R. 329, 334 (Bankr. N.J. 1995); *In re First Magnus Financial Corp.*, 390 B.R. 667, 679 (Bankr. Ariz. 2008), *aff'd*, 403 B.R. 659, 666 (D. Ariz. 2009).

involving the bankruptcy status, priority or collectibility of the DOL claim once liquidated, is, unlike the State-law New York WARN Act issues to be decided in the Administrative Proceeding, a bankruptcy-law matter to be decided by this Court after liquidation, and before payment, of the claim.

## POINT II

### THE COMMISSIONER, NOT THIS COURT, MUST DECIDE THE MERITS OF FORTUNOFF'S SUPPOSED NEW YORK WARN ACT AFFIRMATIVE DEFENSES

Inasmuch as the Administrative Proceeding is exempt from the bankruptcy stay, the Trustee's claim that Fortunoff has "a complete defense" to the Administrative Proceeding "based on any one of the Affirmative Defenses," namely, "the liquidating fiduciary defense, the unforeseen business circumstances defense, the faltering company defense and the good faith defense" (Complaint ¶¶ 21 and 30), must be decided in the Administrative Proceeding by the Commissioner subject to review by New York courts, not by this Court on Plaintiff's Motion for a preliminary injunction or through adjudication of the Complaint. As discussed above, the automatic bankruptcy stay does not prevent completion of the Administrative Proceeding pursuant to the Code's § 362(b)(4), nor has the Trustee identified any other valid basis for the Court to enjoin the Administrative Proceeding. Accordingly, it cannot do so.

Nor should the Court even want to substitute its judgment of such State-law issues for that of the State tribunals where the new, as-yet-unconstrued New York Act can most appropriately be interpreted in light of the Trustee's factual showing and legal argument for whatever defenses or other points he may wish to raise. *See, e.g., Thompson v. Magnolia Petroleum Co.,* 309 U.S. 478, 481-2 (1940) (even when a bankruptcy court has "exclusive and nondelegable control... [,] proper exercise of that control may... lead the bankruptcy court to

consent to submission to State courts of particular controversies involving unsettled [State-law] questions"); *First Nat'l Bank v. Reed*, 306 F.2d 481, 487-8 (2d Cir. 1962) (Friendly, J.) (where a state law has not been authoritatively construed, bankruptcy court should direct that receiver "institute appropriate proceedings in the Vermont courts, under Vermont's Declaratory Judgments Act... or otherwise, [to] prevent what might be either a failure to grant full effect to Vermont's policies... or a harsher application of them than Vermont itself would give").[20]

While this is not an abstention case (since no basis for the Court to act exists), courts faced with abstention motions under 28 U.S.C. § 1334

> have considered one or more (not necessarily all) of twelve factors: (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law, (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted 'core' proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden of [the bankruptcy court's] docket, (10) the likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of non-debtor parties.

*Cody, Inc. v. County of Orange*, 281 B.R. 182, 190-1 (S.D.N.Y. 2002) (citations omitted), *app. dismissed*, 338 F.3d 89, 96-7 (2d Cir. 2003). Here most of the twelve factors – including, at a

---

[20] *Cf. Coker v. Pan American World Airways, Inc.*, 950 F.2d 839, 845-6 (2d Cir. 1991) (recognizing desirability of bankruptcy courts' acting "in the interest of comity with State courts or respect for State law" so as to "manifest federal respect for State law and policy"); *Crossley v. Lieberman*, 90 B.R. 682, 695-6 (E.D. Pa. 1988) (since "it would be far more appropriate for the question of regulation of Pennsylvania attorneys by Pennsylvania statute or regulation to be decided by the courts of Pennsylvania," court abstains from and dismisses without prejudice portion of complaint brought under Pennsylvania statute), *aff'd on other grounds*, 868 F.2d 566 (3d Cir. 1989).

minimum, 2-8 and 10 – would (even if there were a basis for the Court to act) favor abstention from deciding affirmative defenses under the New York Act, a new and unsettled statute, especially since even when analogous defenses have been adjudicated under the Federal WARN Act, New York tribunals construing the new New York Act would be entitled to take a fresh look.[21] In any event the Federal WARN Act cases have not, in fact, produced bright-line rules but call for judgment and discretion which, in applying the New York WARN Act, should also be exercised by New York tribunals in the first instance in the context of facts developed at an administrative hearing by the Trustee and DOL. *See* the discussion of the particular "Affirmative Defenses" whose validity the Trustee asserts, below.

### A. The "Liquidating Fiduciary" Affirmative Defense

Like the Federal WARN Act, 29 U.S.C. § 2101(a)(1), the New York Act defines "employer" as "any business enterprise" employing sufficient workers. Labor Law § 860-a(3). In cases under the Federal Act. courts have found that a company in bankruptcy remains a business enterprise bound by the duty to give notice of layoff as long as it is operating as a going concern, not solely as a liquidator or as a secured lender protecting its collateral. Under that standard, Fortunoff's supposed Affirmative Defense to the New York WARN Act Administrative Proceeding should likely be rejected, but the Commissioner and New York courts

---

[21] As discussed earlier, regulations under the New York Act depart at significant points from those under the Federal Act. Even when statutory or regulatory language is similar, New York tribunals are not constrained to read the New York language in the same way federal language has been interpreted. *See, e.g., People v. Roth*, 52 N.Y.2d 440, 448 (1981) ("the ruling of a Federal court interpreting a Federal statute has no direct bearing upon a State court's analysis of an analogous provision enacted by the State Legislature"); *Leider v. Ralfe*, 387 F.Supp.2d 283, 288-9 (S.D.N.Y. 2005) (even though Donnelly Act is "often called a '"Little Sherman Act,' ... interpretation of the Donnelly Act should reflect New York's own state policy"); *People v. P.J. Video, Inc.*, 68 N.Y.2d 296, 303-4 (1986) (uniformity is "to be balanced against other considerations that may argue for a different State rule").

should consider the standard's applicability and application under the New York Act in the first instance.

When promulgating a regulation implementing the Federal Act, 20 C.F.R. § 639.3(a)(2), whose language is also included in the New York WARN Act regulations, 12 NYCRR § 921-1.1(d)(2), the U.S. Department of Labor expressly rejected a suggestion "that 'fiduciaries' in bankruptcy proceedings should be excluded from the definition of employer." Noting that "adequate protections for fiduciaries are available through the bankruptcy courts," the U.S. Department of Labor stated that it

> agrees that a fiduciary whose sole function in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligations of the former employer because the fiduciary is not operating a "business enterprise" in the normal commercial sense. In other situations, where the fiduciary may continue to operate the business for the benefit of creditors, the fiduciary would succeed to the WARN obligations of the employer precisely because the fiduciary continues the business in operation.

*See* 54 F.R. 16042 (Apr. 20, 1989) (comment on § 639.3(a) Definition of "Employer").

> Here, the Debtors' initial bankruptcy filings on February 5, 2009 stated that they sought

> to continue to operate their businesses so that they can continue the Sale Process in order to either (i) sell, as a going concern, in whole or in part, substantially all of its assets, or if such a transaction is not possible, (ii) to wind down the business through an orderly liquidation and going out of business sales....

First Sim Declaration, Main Case Docket # 14, ¶¶ 15-21. Only later, after continuing efforts to find a buyer on a going concern basis proved fruitless, did the Debtors, on February 23, 2009, seek approval of a GOB sale, Second Sim Declaration, Main Case Docket # 223, which the Court granted on February 25, 2009 in an order expressly recognizing the continuing right of State "or other governmental units when enforcing public health and safety laws, criminal, tax, labor, employment... and consumer protection laws" to institute actions or proceedings against

the Debtors. Order Approving Sale, Main Case Docket # 370, ¶ 12. *See* Statement of the Case above.

As stated there, the allegations in the Trustee's present Complaint and Plaintiff's Motion (Docket ## 1 and 2, ¶¶ 14 and 9 respectively), that the Debtors filed a motion "to approve the procedures for the sale of substantially all of the Debtor's assets to liquidators and for the conduct of going out of business sales ('GOB Sales')," are incorrect; the motion actually sought approval "to effectuate a sale of (i) all or some of the Assets as a going concern (the 'Going Concern Sale')," with liquidation a disfavored second or third alternative. Motion for Approval of Sales Procedures, Main Case Docket # 42, ¶ 20. Indeed, when the Unsecured Creditors' Committee sought an extension of the sales process, arguing that the Debtors were moving too quickly to a GOB sale "because this is what the Pre-Petition Bank Lenders Want," Emergency Motion of Creditors' Committee, Main Case Docket # 223, ¶ 10, the Debtors insisted that they were *not* acting solely as liquidators or on behalf of secured lenders, but had continued after the bankruptcy petition to seek going concern buyers and to express a "preference for going concern bids." According to the Debtors, it was "simply inaccurate to claim… that the sale process… was exclusively targeted at liquidation GOB sales." Second Sim Declaration, Main Case Docket # 250, ¶¶ 13-14.

When Fortunoff belatedly notified its soon-to-be-terminated employees of the possibility of termination on February 5, 2009 – and even when the great bulk of the employees were actually terminated on February 13, 2009 – the Debtors were thus not only still operating as a going concern, but still aimed to continue to have the businesses operate as a going concern indefinitely. Even after deciding on and obtaining Court approval for a GOB approach later in February, the Debtors continued to operate their retail business through the beginning of June,

and did not move to convert the case to Chapter 7 until the summer. Since the Debtors, even following the bankruptcy filing, unquestionably aimed "to continue to operate their businesses" – with a continuing primary goal to "sell, as a going concern,... substantially all of its assets" – applying the approach of 20 C.F.R. § 639.3(a)(2) and 12 NYCRR § 921-1.1(d)(2) should lead to rejection of any claim that Fortunoff was no longer an employer covered by the WARN Acts.

This is consistent with judicial decisions on similar issues under the Federal Act. *See, e.g., Teamsters Local 572 v. Weslock Corp.*, 66 F.3d 241, 244 (9th Cir. 1995) ("the crucial question is not the status of the defendant's legal relationship to the business but, instead, if at the time of the plant closing or mass layoff the defendant is responsible for operating the business as a going concern"); *Barnett v. Jamesway Corp.*, 235 B.R. 329, 333-4 (Bankr. S.D.N.Y. 1999) (where corporation voted to liquidate and authorized a liquidating Chapter 11 petition on October 12th, filed the bankruptcy petition on October 18th, but continued normal operations until at least November 3rd when it began going out of business sales, "filing of the bankruptcy petition did not divest it of its obligations under WARN"). Only when special circumstances made it clear that an entity could not possibly be continuing to operate as a going concern have courts found that the entity was no longer a "business enterprise" or employer covered by the Federal WARN Act. For example, a hospital that "surrendered its certificates of need, stopped treating patients, and entered bankruptcy to liquidate its assets" was found to be a liquidating fiduciary rather than an employer. *Official Committee of Unsecured Creditors v. United Healthcare System, Inc.*, 200 F.3d 170, 176 (3d Cir. 1999).

That is very different from the facts of this case – it is as if Fortunoff, before filing a bankruptcy petition, had surrendered its license to do business and stopped selling merchandise. As the *United Healthcare* court explained, *id.* at 178-9:

The more closely the entity's activities resemble those of a business operating as a going concern, the more likely it is that the entity is an "employer;" the more closely the activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the WARN Act... Had United Healthcare's conduct and activities demonstrated a bona fide effort toward reorganization, the evidence may have shown that United Healthcare was an "employer".... Although we find WARN Act liability does not attach under these facts and circumstances, we do not foreclose the possibility that WARN Act liability may apply to other situations where an employer files for bankruptcy and then terminates its employees.

While the "liquidating fiduciary" issue, like other "Affirmative Defenses" urged by the Trustee, can be argued to the Commissioner in the Administrative Proceeding, including presenting any additional facts, at a minimum no basis to require her to accept it has been established.

### B. The "Unforeseeable Business Circumstances" Affirmative Defense

Like the Federal WARN Act, 29 U.S.C. § 2102(b)(2)(A), the New York WARN Act exempts an employer from the statute's notice requirements if "the need for a notice was not reasonably foreseeable at the time the notice would have been required." Labor Law § 860-c(1)(b). In such cases the employer "shall provide as much notice as is practicable and at that time shall provide a brief statement of the basis for reducing the notification period," § 860-c(2).

Both 20 C.F.R. § 639(b)(1) and 12 NYCRR § 921-6.3(a) caution that unforeseeable business circumstances involve a "sudden, dramatic, and unexpected action or condition outside the employer's control," such as an unanticipated contract cancellation or strike; Federal WARN Act decisions reject even seemingly colorable subjective claims. *See, e.g., Allen v. Sybase, Inc.,* 468 F.3d 642, 656-662 (10th Cir. 2006) (Human Resource Director's "underst[anding]" that the September 11, 2001 terrorist attacks "would likely have a devastating impact... and that this would lead to significant additional layoffs" insufficient); *Carpenters District Council of New*

*Orleans & Vicinity v. Dillard Dept. Stores, Inc.*, 15 F.3d 1275, 1282 (5th Cir. 1994) (uncertainty about "when, or even if," a merger would be approved by the Securities Exchange Commission and stockholders did not make it unforeseeable). As with the "liquidating fiduciary" issue, deciding what constitutes "unforeseeable circumstances" involves judgment and consideration of detailed facts, which the Trustee will be free to present in the Administrative Proceeding, not mechanical application of a bright-line test. *See, e.g., Pena v. American Meat Packing Corp.*, 362 F.3d 418, 422 (7th Cir. 2004) (finding a fact issue as to whether it was foreseeable that new U.S. Department of Agriculture rules would lead to a meat packing plant being closed); *Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 589-90 (7th Cir. 2005) (majority finds indictment of major accounting firm insufficiently "probable" to be foreseeable since the Federal WARN Act "deals in reasonable probabilities, not possibilities"), *id.* at 593 (Wood, J., dissenting) (arguing that the question is not "when the company *knows* that a mass layoff is imminent," only when it is foreseeable) (emphasis in original).

In this case, the Debtors' bankruptcy filings in February 2009 attributed Fortunoff's possible need to close "to a host of factors," including, among others: low inventory, tight credit and cash pressures dating back to an earlier reorganization in February and March 2008; "the recent national economic downturn;" "unusually slow sales" for specialty jewelers "in the spring and during the fourth quarter" of 2008; the "high costs of materials and fuel prices;" and "the ongoing housing market decline." First Sim Declaration, Main Case Docket # 14, ¶¶ 15-21; *see* Statement of the Case above. This hardly supports the notion that the possibility of termination was not reasonably foreseeable or that plant closings were due to a sudden, dramatic, and unexpected action or condition outside the employer's control. Even "dismal sales over the 2008 holiday season,... reduced borrowing capacity under the Prepetition Credit Agreement, and the

32

costs associated with the proposed strategic expansion of [Fortunoff's] jewelry line into the Lord & Taylor retail stores," while less long-standing in nature than other factors listed, were hardly unforeseeable, sudden or unexpected.

The Trustee's present Complaint and Plaintiff's Motion (Docket ## 1 and 2, ¶¶ 10-11 and 5-6 respectively) seek to plug the gap by alleging that on January 26, 2009 the Debtors' secured lender Wells Fargo Retail Finance, LLC ("Wells Fargo" or "WF")

> unexpectedly declared a default under the loan agreement with the Debtors and… advised… that it would no longer make advances… alleging that certain inventory earmarked for L&T stores… was improperly included in the borrowing base certificate….
>
> At the insistence of WF, the Debtors entered into a forbearance agreement… whereby Debtors agreed to, *inter alia*, immediately commence efforts to either sell its business as a going concern or to sell all of its assets at going out of business sales and to file a bankruptcy proceeding…. Conditioned on the execution of the Forbearance Agreement by the Debtors, WF agreed to provide limited financing, both pre-petition and post-petition debtor in possession financing, to enable the debtor to liquidate its assets through going out of business sales in the bankruptcy proceeding.

Presumably, Wells Fargo's "unexpected[]" declaration of default and cut-off of financing, and "insistence" on a forbearance agreement, are meant by the Trustee to constitute the unforeseeable business circumstances which should excuse the NY Act's requirements.

Like the supposed "liquidating fiduciary" affirmative defense, this one can be argued to the Commissioner in the Administrative Hearing, including presentation of a full factual case. And as with that defense, it is clear that at least on the current record she will not be obligated to accept it. Not only was the "unexpected[]" cut-off of financing and "insistence" on a forbearance agreement never mentioned in the Debtors' many bankruptcy filings (except possibly through the phrase, "reduced borrowing capacity under the Prepetition Credit Agreement," which if this is what was meant can only have been intended to obscure), but the

fuller account presented to the Court by Wells Fargo presents a quite different picture of whether

any cut-off was "unexpected[]" (or outside Fortunoff's control):

> 10. As noted by Christopher Sim, Fortunoff's chief financial officer ("CFO"), Fortunoff's performance was well below forecasts for the nine months ending November 30, 2008....

> 12. During December and the holiday season, Fortunoff's finances did not fare any better.... Wells Fargo reiterated its prior position to the company and advised Fortunoff, as provided in the Pre-Petition Credit Agreement, that until Wells Fargo could obtain a third party appraisal on the inventory that had been purchased for the Lord & Taylor stores, that inventory could not be included as Eligible Inventory in the borrowing base.

> 13. On January 14, 2009, the pre-petition lenders met with Fortunoff.... At that time, we were advised that Fortunoff had not made any progress in obtaining additional working capital and it was apparent that its liquidity and finances were steadily worsening....

> 15. The pre-petition lenders also discovered that Fortunoff violated the requirements of the Pre-Petition Credit Agreement in several respects....

> 17. In a further effort to work with Fortunoff, the pre-petition lenders entered into a short forbearance agreement... to give Fortunoff additional availability and additional time to consider its opportunities or to file a bankruptcy petition.

February 23, 2009 Declaration of Francis D. O'Connor ("O'Connor Declaration"), Main Case

Docket # 271, ¶¶ 10-17.[22] Whether such facts, or any others which the Trustee may present at an

administrative hearing, amount to unforeseeable business circumstances under the New York

WARN Act can and should be decided by the Commissioner and New York courts.

---

[22] Contrary to the inference left by the Trustee's present Complaint and Plaintiff's Motion, quoted above, the forbearance agreement, Main Case Docket # 271-3 (Exhibit 3 to O'Connor Declaration), also did not require Fortunoff "to liquidate its assets through going out of business sales," instead listing "sale of the Loan Parties as a going concern" as the primary goal to be pursued. *Id.*, ¶ 8(e).

## C. The "Faltering Company" Affirmative Defense

Like the Federal Act, 29 U.S.C. § 2102(b)(1), the New York WARN Act also exempts an employer from normal notice requirements if "at the time the notice would have been required, [it] was actively seeking capital" which "if obtained, would have enabled the employer to avoid or postpone the... termination," and "reasonably and in good faith believed that giving the notice... would have precluded... obtaining the needed capital." Labor Law § 860-c(1)(a). In such cases the employer "shall provide as much notice as is practicable and at that time shall provide a brief statement of the basis for reducing the notification period," § 860-c(2).

The U.S. Department of Labor's implementing regulation for the Federal Act states that the § 2102(b)(1) exception – which the regulation calls the "faltering company" exception – "should be narrowly construed." 20 C.F.R. § 639.9(a). In June 26, 2009 responses to comments on the emergency rule under the New York WARN Act, the DOL stated that it "will apply all exceptions narrowly." 2009 NY REG TEXT 174919 (NS). According to judicial precedent under the Federal Act, the "faltering company" exception "is an affirmative defense... which means the employer bears the burden of establishing its elements," including that the employer was actively seeking capital "at the time the notice would have been required." That time, of course, is 60 days – in the case of the New York WARN Act, it would be 90 days – before actual termination. Even if need for capital was unforeseeable that early (a matter addressed by the other, "unforeseeable circumstances" exception), later efforts to raise capital do *not* bring an employer within this exception. *In re APA Transport Corp. Consol. Litigation*, 541 F.3d 233, 247-9 (3d Cir. 2008).

Although the Trustee asserts that the faltering company issue provides another "complete defense" to the Administrative Proceeding (Complaint and Plaintiff's Motion, ¶¶ 30 and 25

respectively), there appears not even to be a claim that Fortunoff was actively seeking capital 90 days before the February 13, 2009 terminations. On the contrary, the Debtors' initial bankruptcy filing stated that Fortunoff had "aggressively pursued an equity investment" only "since the end of the holiday season of 2008." First Sim Declaration, Main Case Docket # 14, ¶ 19. If there were nevertheless a claim that Fortunoff was actively seeking capital 90 days before it terminated employees, that is, before the 2008 holiday season even began, or if the Trustee has some other theory of this affirmative defense or factual support for such a theory, it, too, should be assessed by the Commissioner and New York courts.

### D. The Good-Faith Reduction-in-Liability Issue

The so-called "good faith defense," the last of the "Affirmative Defenses" identified by the Trustee (Complaint and Plaintiff's Motion, ¶¶ 21 and 16 respectively), is not, as he asserts (*id.* ¶¶ 30 and 25 respectively), a "complete defense" to a New York WARN Act claim at all. Rather, Labor Law § 860-g(6) states:

> If an employer proves to the satisfaction of the commissioner that the act or omission that violated this article was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this article, the commissioner may, in his or her discretion, reduce the amount of liability provided for in this section. In determining the amount of such reduction, the commissioner shall consider (a) the size of the employer; (b) the hardships imposed on employees by the violation; (c) any efforts by the employer to mitigate the violation; and (d) the rounds for the employer's belief.

*Cf.* Labor Law § 860-h(6) (similar language concerning reduction in penalty). Not only is this no basis to enjoin the Administrative Proceeding, but it appears from § 860-g(7) (which authorizes a court considering a New York WARN Act claim to reduce only "the amount of any penalty," *not* the basic New York Act liability, based on employer good faith) that a good-faith defense to a liability claim can be addressed *only* to the Commissioner in an administrative proceeding.

In short, consideration of the particular "Affirmative Defenses" which the Trustee asserts only underscores that the Commissioner, not this Court, must decide them.

**POINT III**

**GENERAL EQUITABLE PRINCIPLES DO NOT SUPPORT AN INJUNCTION**

The Trustee argues, in the alternative, that equity supports an injunction against completion of the Administrative Proceeding even if the automatic bankruptcy stay does not. Plaintiff's Motion, ¶ 37, incorrectly implies that a preliminary injunction can be granted even if the Trustee is not found likely to prevail on his underlying Complaint, supposedly based on *Citigroup Global Markets, Inc. v. VCG Special Master Opportunities Master Fund Ltd.*, 598 F.3d 30, 34-36 (2d Cir. 2010). *Citigroup*, while holding that there is *generally* a flexible standard in preliminary injunction cases, expressly recognized three exceptions, the first two of which are relevant here: "First, [w]here the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme,.... Second, ... 'when the requested injunction (1) would provide the plaintiff with "all the relief that is sought" and (2) could not be undone....'" *Id.* at 35 n. 4 (citations omitted). In such cases, and here, a plaintiff who seeks a preliminary injunction must indeed establish a likelihood of success on the underlying claim. *See also, e.g., VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 185-6 (2d Cir. 2010) (discussing the first of the *Citigroup* exceptions, injunctions staying a government from acting in the public interest pursuant to a statutory or regulatory scheme). Of course, if a complaint should simply be dismissed – like this one, since it is clear the Trustee has not stated a valid basis for the relief he seeks – it is even clearer that an injunction cannot be granted.

Nor could the Trustee, in any event, establish irreparable harm. His argument is that the estate "will be irreparably harmed if it is forced to litigate the same issues in different forums,"

through "unnecessary incurrence of legal fees and expenses" and potentially "conflicting judgments." Plaintiff's Motion, ¶ 40; *cf.* Complaint, ¶ 33 (alleging that the Administrative Proceeding should be enjoined so that the Trustee need not litigate similar issues in two forums). The risk cited by the Trustee is unsubstantiated and illusory.

If both the DOL and individual workers brought claims under the New York WARN Act in authorized forums and the Trustee must respond to both, that is not "harm," much less "irreparable harm," but a feature of the scheme the New York Legislature established, *see* New York Labor Law § 860-g(4)(e) and (f) (contemplating that employer may face both an administrative proceeding and a private action, while providing that there shall not be duplicate liability). To the extent that the issues on two claims are truly the same, legal fees and expenses in responding will be limited by the fact that the same work will largely serve for both, even if in separate forums. To the extent the issues differ, fees and expenses would have to be incurred even if both claims were in one forum.

The same kind of point can be made about the risk of "conflicting judgments" cited by the Trustee. It is true that this Court, not the Commissioner, must decide the Iannacone Action and objections that may be filed to individual proofs of claim, including those under the New York Act, but to the extent that issues genuinely overlap with those in the Administrative Proceeding, the Court can and should accept a State tribunal's resolution of State-law issues. To the extent that issues, for example under the Federal WARN Act which the Commissioner does not enforce, do not overlap those in the Administrative Proceeding, they would have to be separately litigated and considered even if all proceedings were in one forum.

That does not mean that the Court cannot give the Commissioner's findings such persuasive force as it finds appropriate, even as to issues which the Administrative Proceeding

does not directly cover; indeed the Administrative Proceeding could wind up saving the estate fees. As a practical matter, duplication of claims appears far less likely to cause problems than the Trustee's rhetoric about irreparable harm and over a thousand individual claims suggests. The Iannacone Action, the only claim besides the DOL's which has been pursued, is not far advanced and the Court has already expressed awareness that it overlaps the DOL claim. The Court has also already noted that if the Iannacone plaintiffs have genuine grounds to pursue non-Debtor defendants with assets beyond those of the bankruptcy estate on a single-employer theory, that may be done through a separate, non-bankruptcy action. While the Court would have to consider any contrary arguments, it is not clear that any genuine issues (other than bankruptcy-law issues such as claims' classification, which the Court must decide) will remain once the Commissioner, in liquidating the DOL claim, evaluates the affirmative defenses or other points raised by the Trustee.

While there is thus no likelihood of irreparable (or any substantial) harm from completion of the Administrative Proceeding, enjoining it would irreparably harm the DOL because in the first case arising under a new and unsettled New York statute, issues of interpretation of State law would not be decided by the tribunal authorized to do so by the Legislature. *Cf. Nippon Steel Corp. v. United States*, 219 F.3d 1348, 1353-4 (Fed. Cir. 2000) (whether or not court had jurisdiction to do so, improper to enjoin federal agency from continuing authorized administrative proceeding).

## CONCLUSION

For these reasons, the Court should deny Plaintiff's Motion for a preliminary injunction,

and dismiss the Complaint.


Dated: August 20, 2010

PATRICIA KAKALEC

Chief of Labor Bureau

SETH KUPFERBERG
Chief of General Labor Section

Respectfully submitted,

ANDREW M. CUOMO
ATTORNEY GENERAL OF NEW YORK
120 Broadway
New York, New York 10271
(212) 416-8856

By:
SETH KUPFERBERG (SK-4511)
Assistant Attorney General